UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SHEIDA HUKMAN,<br><br>                                      Plaintiff,<br>v.<br>TERRIBLE HERBST INC.,<br><br>                                      Defendant. | Case No. 2:21-cv-01279-ART-VCF<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

This is a civil rights action brought by plaintiff Sheida Hukman, alleging various claims of employment discrimination against her former employer, Terrible Herbst Inc. ("Terrible's"). Defendant moves for summary judgment, arguing that Hukman was never discriminated against and that her employment ended due to insubordinate and erratic conduct. (ECF No. 75.) Defendant argues that Hukman does not, and cannot, provide sufficient evidence to the contrary. For the following reasons, the Court grants Defendant's motion for summary judgment.

I.   BACKGROUND

   A. Factual Background

Hukman is a woman of Middle Eastern and Kurdish descent from Iraq. (ECF No. 38-1 at 2.) Hukman started working as a cashier at Terrible's, a convenience and gas station store, in September 2017. (ECF Nos. 38-1 at 2; 75-3 at 23.) Her starting pay was $8.50 per hour. (ECF No. 75-3 at 24.) Hukman worked the graveyard shift from around 10 p.m. to 6 a.m. (*Id.* at 25.) This case concerns events that led to Hukman's departure from Terrible's in March 2020.

In March 2018, Hukman sent an email to her manager, Janell Hooks,

1

stating that she believed an individual named Fatemah Tehrani was causing issues and asking Janell to let her know if she was contacting her "to play drama." (ECF No. 75-8 at 3.) Tehrani is not a party to this case and there is no evidence suggesting that she was ever employed by Terrible's. During her deposition, Hukman stated that Fatemah Tehrani is an "Iranian lady" who bribed a judge in an employment discrimination case Hukman brought against a former employer. (ECF No. 75-3 at 11–12.) Hukman transferred to a different store at around this time. (ECF No. 75-3 at 37–40.)

In July 2018, Hukman received a disciplinary notice based on a customer service complaint "about an interaction with a slot customer." (ECF No. 75-6.) In response, Hukman stated that Laura Williams-Anderson had come to speak with Hukman's supervisors and "asked them to play drama and get involved in my personal business." (ECF No. 75-7.) Laura Williams-Anderson is not a party to this case and Hukman does not contend that she was ever employed by Terrible's.

During her deposition, Hukman testified that Laura Williams-Anderson is a former coworker who had harassed stalked her at subsequent jobs, including at Terrible's. (ECF No. 75-3 at 4, 14.) Hukman testified that Laura Williams-Anderson works with Fatemah Tehrani "for the Israeli government" and came to the store invisibly and told employees to harass her. (ECF No. 75-3 at 39–40.)

In August 2018, Hukman wrote a letter to human resources stating that Janel Hooks was harassing her upon instruction and payment from Fatemah Tehrani. (ECF No. 75-9.) In September 2018, Hukman sent an email to Whitmore claiming that her manager, Sam Nakoma, was retaliating against her because of her complaint against Hooks. (ECF No. 75-10.) Hukman said Nakoma was "helping Fatemah to [m]urder [Hukman] and blame it on Terrible Herbst" and sending individuals to harass and discriminate against her. (*Id.* at 2.) In October 2018, Hukman emailed Jason King, a district manager at Terrible's, complaining that Nakoma had refused to interview her for a promotion, and claiming that

Tehrani and Williams-Anderson had tried to murder her and called her a terrorist because of her national origin. (ECF Nos. 75-11, 75-3 at 48.)

In February 2019, assistant store manager Eric Ruelas wrote a statement complaining that Hukman had asked him if he had mixed chemicals to kill her. (ECF No. 75-15.) The interaction "made [Ruelas] and other employees very uncomfortable" and Ruelas requested that Hukman be transferred, stating that since his first day at work she had "never let up with numerous outlandish accusations." (*Id.*) In April 2019, Ruelas emailed human resources complaining that Hukman had called his store phone and accused him of stalking her and being with "an Iranian wom[a]n that hates her." (ECF No. 75-16.) In a statement the next day, he said that she had accused him of mixing chemicals to kill her; accused him of stalking her; and tried to blackmail him by saying that he had photos of him with the Iranian woman. (ECF No. 75-17.) That same day, Hukman emailed human resources to inform them that Ruelas had been stalking her and was "involved with the Tehrani and Anderson Family." (ECF No. 75-18.)

In February 2020, Hukman received a second disciplinary notice after her supervisor, Michael Turner, came into the store and found Hukman "sleeping in the chair." (ECF No. 75-12.) In the comments section, Hukman stated that she had not been sleeping, was dizzy from a smell, and that Turner was "helping Fatemah Tehrani to get me terminated because she wants to murder me." (ECF No. 75-12 at 2.) Later that month, Hukman emailed employee relations a letter complaining about Turner. (ECF No. 75-14.) In the letter, Hukman stated that Turner was "very [l]oud, disrespectful, [a]rgumentative, [r]ude and [n]asty." (*Id.* at 3.) Under the heading "harassment and discrimination by Michael Turner," Hukman described several incidents in which she alleged that Turner assigned her additional duties that she was not responsible for. (*Id.* at 4–5.)

Around February 2020, Hukman interviewed for the position of store manager. (ECF No. 75-3 at 55.) She had applied in January. (ECF No. 75-19.)

3

On March 5, 2020, Hukman was informed that she was not selected for the position and requested an explanation. (ECF No. 75-20.) She stated that she "answered all the interview [q]uestions [c]orrectly" and that there was no disciplinary action in her file. (*Id.* at 2.)

Parties dispute the details of an incident in March 2020 which resulted in Hukman's departure from Terrible's. On March 17, 2020, Hector Castaneda, another Terrible's cashier, gave a statement detailing an incident between Hukman and Turner. (ECF No. 75-22.) He stated that when Turner asked her for the keys, Hukman "snap[ped] at [him] with a loud voice and said don't talk to me like that again" and then "threw them on the floor." (*Id.*) Hukman was suspended pending investigation of the incident. (ECF Nos. 75-23; 75-24.) In response, Hukman said that Turner had been harassing her, telling people that she would get fired, and called her a terrorist. (*Id.*) She said that she called the police because she was scared. (*Id.*) Hukman had a call with human resources to discuss her suspension. (ECF No. 75-25.) On March 19, 2020, Terrible's sent Hukman a memo of understanding stating that Hukman's actions violated company policy and that she would be transferred to another store. (ECF No. 75-26.) On March 24, 2020, Hukman resigned. (ECF No. 75-27.)

### B. Procedural Background

Hukman filed this action against Terrible's in state court in March 2021, alleging various employment discrimination claims. (ECF No. 1.) Defendant removed the action to this Court in July 2021. (*Id.*) After the Court granted in part Defendant's second motion to dismiss, the following claims remain:

(1) National origin discrimination, in violation of Title VII, based on: (a) assignment of more duties than others in the same job; (b) denial of meal and rest breaks; (c) denial of promotions; and (d) denial of Spanish Premium Pay;

(2) Retaliation, in violation of Title VII;

(3) Harassment, in violation of Title VII;

(4) Constructive termination;

(5) Violation of Equal Pay act and Nevada state equal pay law.

## II.     LEGAL STANDARD

The party moving for summary judgment must show that there is no genuine issue as to any material fact. See Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Rather, the Court views the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Behrend v. San Francisco Zen Ctr., Inc.*, 108 F.4th 765, 768 (9th Cir. 2024).

## III.    DISCUSSION

Terrible's asserts that it is entitled to summary judgment, arguing that Hukman has failed to establish a prima facie case on any claim. The Court addresses each in turn.

### A. National Original Discrimination

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees based on national origin. 42 U.S.C. § 2000e-2(a). To state a prima facie case of disparate treatment, a plaintiff must show that (1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably. *Sischo–Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1109 n.7 (9th Cir. 1991) (superseded by statute on other grounds). The evidence

5

1  necessary to establish a prima facie case is minimal but must be more than
2  conclusory allegations of discrimination. *Peterson v. Hewlett–Packard Co.*, 358
3  F.3d 599, 603 (9th Cir. 2004). If the plaintiff establishes a prima facie case, the
4  burden of production shifts to the defendant to offer evidence of legitimate
5  nondiscriminatory reasons for the adverse employment action at issue. *McDonnell*
6  *Douglas Corp v. Green*, 411 U.S. 792 (1973). If the defendant meets that burden,
7  the plaintiff must then show that the employer's proffered reason is merely
8  pretext for a discriminatory motive. *Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d
9  1123, 1126 (9th Cir. 2001).

10  Hukman alleges that Terrible's discriminated against her based on national
11  origin by: assigning her more duties than others in the same job; denying her
12  meal and rest breaks; denying her promotions; and denying Spanish premium
13  pay. Though Terrible's does not dispute the first element (national origin), it
14  argues that Hukman has failed to establish a prima facie case of national origin
15  discrimination on any of her theories.

### a. Assignment of more duties

17  Hukman alleges that she was assigned more duties to perform during her
18  shift than other cashiers. (ECF No. 38-1 at 6.) She claims that she was assigned
19  cleaning duties that other cashiers were not responsible for, including cleaning
20  the coffee machine, ice machine, hot dog grill, windows, refrigerator doors,
21  storage shelves—and was responsible for receiving deliveries and assisting the
22  store's manager with monthly inventories and weekly order. (*Id.* at 2, 10.)
23  However, Hukman has not provided evidence to support this claim and does not
24  mention it in her declaration. (*See* ECF No. 85 at 21-23.)

25  In fact, Hukman contradicts this claim in her deposition. She describes the
26  job responsibilities of a cashier as including cleaning the fountain drinks, grills,
27  shelves, floor, and stocking shelves. (ECF No. 75-3 at 26–27.) She explains that
28  "basically most of the cashiers, they all do the job." (*Id.* at 27.) Hukman's

testimony suggests that similarly situated individuals were not treated more favorably: all cashiers had similar job responsibilities. Hukman has therefore failed to establish a prima facie case of disparate treatment.

### b. Denial of Spanish premium pay

Hukman alleges that Terrible's offers a Spanish premium pay program to its employees, under which employees who speak Spanish are eligible for pay increases. (ECF No. 38-1 at 2.) Although Hukman speaks Spanish, she claims that she never received the premium pay while other non-Kurdish and non-Iraqi employees did. (*Id.*) Terrible's responds that this program does not exist and that it has never paid any employee Spanish premium pay. (ECF Nos. 75 at 17; 75-5 at 4.)

In her affidavit, Hukman repeats her claim in a conclusory statement. (ECF No. 85 at 21.) In deposition testimony, Hukman claims that a Mexican employee at another store told her that they were paid an extra dollar per hour for speaking Spanish. (ECF No. 31 at 88–89.) But Hukman has not named this employee or provided any evidence from another employee supporting her claim. "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). Hukman's deposition testimony alone, without even a name of the employee she alleges is paid more for speaking Spanish, is insufficient to establish a prima facie case.

### c. Denial of meal and rest breaks

Hukman alleges that despite being entitled to take a paid thirty-minute lunch break and two paid ten-minute breaks, she was never advised to take them. (ECF No. 38-1 at 5, 11.) She alleges that other cashiers outside her protected class were allowed to take these breaks. (*Id.*) Hukman provides some evidence to support this claim in the form of deposition testimony and an affidavit, but these are conclusory. In her deposition, Hukman states that Terrible's "never told me

7

to take breaks" and that she heard from other stores that the agents who worked the graveyard shift "close the store for half an hour" to take a break. (ECF No. 75-3 at 29.) In her declaration, she states that she was not advised to take these breaks while others outside her protected class were. (ECF No. 85 at 22.) This evidence does not suggest that she was denied these breaks; just that she was not advised to take them. This claim fails because there is no evidence that Terrible's ever denied Hukman her meal or rest breaks or prevented her from taking those breaks.

### d. Denial of promotions

Hukman claims that in March 2020, she was denied a promotion to store manager and the position went to a non-Kurdish individual. (ECF No. 38-1 at 12, 13.) For a failure to promote claim, a plaintiff must show that (1) she belongs to a protected class; (2) she applied for and was qualified for the position she was denied; (3) she was rejected despite her qualifications; and (4) the employer filled the position with an employee not of plaintiff's class, or continued to consider other applicants whose qualifications were comparable to plaintiff's after rejecting plaintiff. *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005).

Hukman has shown that she belongs to a protected class and that she applied for and was rejected the position of store manager but has not shown that she was qualified for the position. Hukman supports her claim only with self-serving conclusory statements, stating that she "provided excellent customer service," "had an excellent attendance record" and "never had a customer complaint." (ECF No. 85 at 21.) But an employee's subjective personal judgments of her competence alone do not a raise a genuine issue of material fact. *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).

Even if Hukman had established a prima facie case, Terrible's have offered sufficient evidence to show that Hukman was not qualified for the position.

1   Contrary to Hukman's contentions, she received at least one customer complaint.
2   (ECF No. 75-6.) Hukman's coworker, Ruelas, also filed several complaints against
3   Hukman describing erratic behavior, and requested that she be transferred to a
4   different store. (ECF Nos. 75-15; 75-16; 75-17.) And in February 2020, Hukman's
5   manager reported that she had been sleeping in a chair while a customer was in
6   the store. (ECF No. 75-12.) Hukman has not demonstrated that these legitimate
7   reasons for denying her promotions are pretextual.
8       Because Hukman has not produced sufficient evidence to make a prima
9   facie case of national origin discrimination on any of her four theories of liability,
10  the Court grants Defendant summary judgment on this claim.

### B. Hostile Work Environment

12      To prevail on a hostile work environment claim based on national origin,
13  Hukman must show that: (1) she was subjected to verbal or physical conduct
14  because of her national origin; (2) the conduct was unwelcome; and (3) the
15  conduct was sufficiently severe or pervasive to alter the conditions of the
16  plaintiff's employment and create an abusive work environment. *Kang v. U. Lim*
17  *Am., Inc.,* 296 F.3d 810, 817 (9th Cir. 2002). To determine whether conduct was
18  sufficiently severe or pervasive to violate Title VII, courts look at "all the
19  circumstances, including the frequency of the discriminatory conduct; its
20  severity; whether it is physically threatening or humiliating, or a mere offensive
21  utterance; and whether it unreasonably interferes with an employee's work
22  performance." *Vasquez v. Cnty. Of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003)
23  (citation omitted)).
24      Hukman alleges that assistant manager Michael Turner harassed her
25  because he thought she was a terrorist based on her national origin. (ECF No.
26  38-1 at 13.) She does not provide details of specific incidents in her declaration,
27  but merely states again that she was harassed by Turner on a daily basis based
28  on her national origin and because he thought she was a terrorist. (ECF No. 85

at 21.) In a February 2020 letter addressed to human resources, Hukman describes some specific instances of harassment. (ECF No. 75-14.) Hukman alleges that in December 2019, after a customer vomited outside, Turner sent her outside to clean the vomit "in a very disrespectful way." (*Id.* at 4.) In December 2020, when Turner came to work at the end of Hukman's nightshift, he was "very mad, rude and nasty, yelling and screaming" and saying that she had not cleaned the bathroom, without checking the bathroom first. (*Id.* at 5.) In January 2020, Turner called Hukman into his office and falsely accused her of "not making one of the [d]rops" and "screamed" at her in a "very abusive way." (*Id.*) In February 2020, when Hukman was sitting in a chair because she felt dizzy, Turner yelled at her again. (*Id.* at 5.) Hukman alleges that he had been talking to Fatemah Tehrani who had given him chemicals to poison her. (*Id.* at 6.)

Viewing this evidence and drawing all reasonable inferences in Hukman's favor, Turner yelled at Hukman in an abusive manner on four separate occasions over the course of more than one year. The only evidence suggesting that these incidents were based on race is Hukman's claim that Turner thought she was a terrorist. Although undoubtedly offensive, four remarks over the course of a year are not pervasive enough to support a hostile work environment claim. *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 643 (9th Cir. 2003) (finding no hostile work environment where employee was yelled offensive remarks about plaintiff being Hispanic twice in front of others); *Manatt v. Bank of Am., NA*, 339 F.3d 792 (9th Cir. 2003) (finding no hostile work environment where coworker made several offensive racial comments and acts over the course of two years); *Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1111 (9th Cir. 2000) (finding no hostile work environment where the supervisor made sexist remarks about employees and plaintiff on several occasions). Because Hukman has not provided evidence showing that Turner's conduct was pervasive enough to constitute a hostile work environment, the Court grants Defendant summary judgment on this claim.

**C. Retaliation**

Title VII forbids employers from retaliating against an employee who seeks to bring a discrimination claim against the employer. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII, the plaintiff must show that she (1) engaged in a protected activity, (2) suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment decision. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002). If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action. *Id.* Once the employer carries this burden, the plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was pretext.

Hukman has demonstrated the first two elements necessary for a prima facie case. Hukman has demonstrated that she engaged in a protected activity: she submitted a complaint about harassment and discrimination to human resources about her manager, Michael Turner. (ECF No. 75-14.) *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002) (filing an internal complaint constituted protected activity). And Hukman has shown that she suffered an adverse employment action: she was informed that she would be transferred to another store. (ECF No. 75-26.) Instead of accepting the transfer, Hukman chose to resign. (ECF No. 75-27.) *See Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840 (9th Cir. 2004) (the Ninth Circuit defines "adverse employment action" broadly).

Defendant argues that Hukman's retaliation claim fails to establish a causal connection between the protected activity and adverse employment decision. To satisfy the causation element, Hukman must provide evidence that the unlawful retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v.*

1  *Nassar*, 570 U.S. 338, 360 (2013). "[W]hen adverse employment decisions are
2  taken within a reasonable period of time after complaints of discrimination have
3  been made, retaliatory intent may be inferred." *Passantino v. Johnson & Johnson*
4  *Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000). Here, Hukman
5  submitted a complaint against Michael Turner in February 2020 and was
6  informed that she would be transferred the following month. Terrible's stated
7  reason for the transfer was the incident that occurred in March 2020 between
8  Hukman and Turner. Drawing all inferences in the light most favorable to
9  Hukman, that incident—and the subsequent decision to transfer her—would not
10 have happened but for her complaint against Turner.

11 However, Terrible's presents legitimate reasons for the transfer decision: a
12 violation of the store's code of conduct. After Hukman was suspended pending
13 investigation, she met with Natasha Tiffany to discuss the suspension. (ECF No.
14 75-25.) In her summary of the call, Tiffany notes that Hukman asked about her
15 complaint against Turner and Tiffany responded that she had received the
16 complaint, but that Hukman had not provided "substantial evidence to support
17 her complaint." (ECF No. 75-26.) Tiffany notes concerns that Hukman is "very
18 un-predictable" and may cause "physical harm to others," in part because "[i]n
19 the video provided, she displays to be the aggressor." (*Id.*) Tiffany then sent
20 Hukman a "memo of understanding" explaining that Hukman had violated the
21 company's code of conduct. (ECF No. 75-26.) Hukman has not offered any
22 evidence suggesting that these legitimate reasons were pretextual.

23 The Court therefore grants Defendant summary judgment on Hukman's
24 retaliation claim.

### D. Constructive Discharge

26 A constructive discharge under Title VII occurs "when a person quits [her]
27 job under circumstances in which a reasonable person would feel that the
28 conditions of employment have become intolerable." *Lawson v. Wash.*, 296 F. 3d

12

1   799, 805 (9th Cir. 2002). A plaintiff must show "aggravating factors, such as a
2   continuous pattern of discriminatory treatment." *Sanchez v. City of Santa Ana*,
3   915 F.2d 424, 431 (9th Cir. 1990) (internal quotations omitted). Nevada law also
4   recognizes a tortious constructive discharge claim and has adopted the same
5   standard as the Ninth Circuit for a federal claim. Nev. Rev. Stat. § 613.330; *Martin*
6   *v. Sears, Roebuck & Co.*, 899 P.2d 551, 553 (Nev. 1995) ("A constructive discharge
7   has been held to exist when an employer creates working conditions so intolerable
8   and discriminatory that a reasonable person in the employee's position would feel
9   compelled to resign.")

10  Hukman's constructive discharge claim fails as a matter of law for the same
11  reasons as her hostile work environment claim: there is insufficient evidence of
12  discriminatory treatment by Terrible's from which a reasonable juror could
13  conclude that Hukman's work environment was intolerable. "Where a plaintiff
14  fails to demonstrate the severe or pervasive harassment necessary to support a
15  hostile work environment claim, it will be impossible for her to meet the higher
16  standard of constructive discharge: conditions so intolerable that a reasonable
17  person would leave the job." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th
18  Cir. 2000). The Court therefore grants Defendant summary judgment on
19  Hukman's constructive discharge claim.

20  **E. Violation of Equal Pay Act and Nevada State Equal Pay Law**

21  Both the Equal Pay Act and Nevada Revised Statute 608.017 prohibit
22  employers from discriminating on the basis of sex by paying employees of the
23  opposite sex different wages for substantially equal work. 29 U.S.C. § 206(d)(1);
24  *Freyd v. University of Oregon*, 990 F.3d 1211, 1219 (9th Cir. 2021); NRS 608.017.
25  "To make out a case under the Equal Pay Act, a plaintiff must prove that an
26  employer is paying different wages to employees of the opposite sex for equal
27  work." *Hein v. Oregon College of Education*, 718 F.2d 910, 913 (9th Cir. 1983).
28  Hukman has not met her burden of establishing a prima facie case of

discrimination by showing that employees of the opposite sex were paid different wages of equal work. Hukman alleges that other male employees were offered additional money for speaking Spanish. (ECF No. 38-1 at 2.) In her deposition, Hukman stated that some males were paid $9.50 per hour but said that she could not remember their names. (ECF No. 75-3 at 33.) In response to the motion for summary judgment, Hukman alleges that "Mr. Donald" was paid more than her. (ECF No. 85 at 17.) In reply, Terrible's explains that Donald Hunt, a cashier at one of the store locations that Hukman worked, was in fact paid $8.00 per hour— less than Hukman's $8.50 per hour. (ECF No. 91 at 11.) Hukman does not name any other employees who were named more than here. Because Hukman has not provided evidence to create a genuine issue of material fact on this claim, the Court grants Defendant summary judgment on this claim.

### IV.  CONCLUSION

IT IS THEREFORE ORDERED that Defendant's motion for summary judgment (ECF No. 75) is GRANTED.

The Clerk of Court is directed to enter judgment in favor of Defendant Terrible Herbst Inc. and close this case.

DATED: March 7, 2025

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

14